FREDERICK W. BABCOCK *vs.* WILLIAM C. HUNTOON.

MAY 3, 1915.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)  *Accord and Satisfaction.  Agreement as Satisfaction.*

While accord without satisfaction will not avail as a defence and satisfaction supposes that the thing stipulated to be done has not only been done, but has been accepted in satisfaction, yet, it is possible for the *promise* itself to be accepted in satisfaction.

If an agreement and not the performance thereof is accepted in satisfaction of a demand and the agreement to accept is based on a sufficient consideration the demand is extinguished. Under these circumstances there is a valid accord and satisfaction even though the agreement is not performed, and the sole remedy of either party in case of non-performance is by action for breach of the new agreement. Whether the promise has been accepted in satisfaction must be determined from the circumstances of each case. The burden is upon the party setting up the new promise to prove the agreement by a preponderance of the evidence.

(2) *Accord and Satisfaction.*

As a defence to an action upon an agreement defendant set up, that in consideration that defendant undertook and promised plaintiff that he would assign to him certain shares in a corporation, plaintiff accepted the undertaking in satisfaction of the obligations in the agreement in the case at bar. Defendant's evidence tended to prove that the certificate of stock was executed but never taken by plaintiff and plaintiff did not execute a release of defendant's obligations under the prior agreement nor a paper agreeing contingently to pay defendant ten dollars a share more.

*Held,* that the evidence showed an accord and satisfaction.

*Held,* further, that while the release and paper to be executed by plaintiff would have been of assistance to defendant in proving the alleged new agreement, the fact that plaintiff did not execute them did not affect defendant's rights under the new agreement.

(3) *Evidence.*

In an action where defendant had pleaded in satisfaction an agreement on the part of plaintiff to accept certain shares of stock, where there had already been put in evidence a letter from plaintiff to defendant's brother in which plaintiff returned a certificate of stock sent him by the brother of defendant, stating his reasons for so doing, a letter from the brother in reply was admissible as tending to show whether or not he accepted the stock without objection, and whether or not he assented to the statements in plaintiff's letter.

(4) *Contracts. Accord and Satisfaction. Equitable Pleas.*

Where to an action on an agreement defendant set up as an equitable defence that the parties thereafter entered into an oral agreement whereby in consideration that the defendant promised the plaintiff that he would transfer to him certain stock the plaintiff agreed that he would never bring any action against defendant upon the agreement in the case at bar, and would receive the stock in full satisfaction and that defendant had always been ready to perform—and plaintiff requested the court to charge that it was no defence to the action that he agreed to cancel defendant's obligation, unless defendant delivered and plaintiff accepted the stock, a modification of such request that if the jury found there was a bargain in consideration of the stock to cancel the agreement, in equity defendant would be entitled to have it carried out, was not error.

ACTION OF DEBT. Heard on exceptions of plaintiff and overruled.

JOHNSON, C. J.   This is an action of debt with a count in covenant joined brought in the Superior Court, in Providence County, on a written agreement under seal dated February 5, 1909, between the defendant and his brother, Harrison B. Huntoon on one side and the plaintiff on the other.

The case was first tried in October, 1912, before Mr. Justice Brown and a jury in the Superior Court and resulted in a verdict for the defendant.   After the denial of a motion for a new trial by the justice presiding, the plaintiff duly filed and prosecuted his bill of exceptions to this court.   The plaintiff's exception that the verdict was against the weight of the evidence was sustained and his other exceptions were overruled and the case was remitted to the Superior Court for a new trial.   A new trial was had in the Superior Court before Mr. Justice Doran and a jury and on the eighth day of January, 1914, a verdict was rendered for the defendant. The plaintiff moved for a new trial on the grounds that the verdict was contrary to the law and the evidence, and his motion was denied by the justice who presided at the trial. The plaintiff has now brought his bill of exceptions to this court.   The nature of the action, the written agreement upon which it was based and the pleadings up to the time of the first jury trial are set out in the opinion of the court, *Babcock* v. *Huntoon*, 35 R. I. 328.

After the new trial was granted by this court and the case remitted to the Superior Court, the pleadings were amended and two additional pleas were filed.   At the second trial the case was submitted to the jury upon the new amended third plea, the new amended fifth plea and the new amended sixth plea, setting up in different forms an accord and satisfaction, it not being disputed that the said agreement of Februrary 5, 1909, on which the action was brought was duly executed and that the plaintiff had duly performed his part of that agreement.

Said new amended third plea alleges that after the execution of the written agreement dated February 5, 1909, to wit, on the 8th day of April, 1911, in said Providence, the

plaintiff and defendant entered into an oral agreement with each other in substitution for the said former agreement by which later agreement in consideration that the defendant then and there undertook and promised to the plaintiff that he would assign and transfer to the plaintiff 1,256 shares of the capital stock of the Babcock Oil Company, being a portion of the shares of the capital stock of said corporation then held and owned by the defendant, the plaintiff then and there accepted the said undertaking and promise of the defendant in satisfaction of all obligations assumed by the defendant in the said agreement of February 5, 1909, and then unperformed, and then and there agreed to and did release and discharge the defendant from all his said obligations and the said former agreement was thereby extinguished and discharged as to the defendant. ·

Said new amended fifth plea by way of equitable defence under the statute permitting equitable defences to be pleaded in actions at law in the Superior Court alleges that after the execution of the written agreement dated February 5, 1909, to wit, on the 8th day of April, 1911, the plaintiff and defendant entered into an oral agreement with each other whereby in consideration that the defendant undertook and promised to the plaintiff that he would assign and transfer to the plaintiff 1,256 shares of said capital stock, the plaintiff promised to the defendant that he said plaintiff would never bring any action against the defendant upon the said written agreement of February 5, 1909, and would receive and accept said shares of stock in full payment and satisfaction of all obligations assumed by the defendant under said written agreement; and since the making of the said oral agreement the defendant has always been ready and willing and has offered and still is ready and willing and hereby offers to perform fully on his part the said oral agreement and therefore the plaintiff cannot in equity and good conscience in violation of the said oral agreement maintain any action against the defendant upon the alleged written agreement of February 5, 1909.

Said amended sixth plea alleges that after the execution of the written agreement dated February 5, 1909, to wit, on the 8th day of April, 1911, the plaintiff and defendant entered into an agreement with each other in substitution for the said former agreement by which later agreement the defendant sold to the plaintiff 1,256 shares of the capital stock of the Babcock Oil Company and the plaintiff bought of the defendant said 1,256 shares of stock and paid for the same by then and there releasing and discharging the defendant from all the obligations assumed by the defendant in the said agreement of February 5, 1909, and then unperformed and the said former agreement was thereby extinguished and discharged as to the defendant.

The plaintiff's bill contains thirteen exceptions. We will first consider the 10th exception, which is to the denial of the motion to direct a verdict for the plaintiff, together with the 13th exception, which is to the denial of plaintiff's motion for a new trial. Much testimony as to the financial condition and state of development of the Babcock Oil Company and the acts of the plaintiff and defendant relative thereto was introduced as bearing upon the probability of the purchase by the plaintiff of the defendant's stock as set up in the pleas. The defence, however, rests essentially upon the agreement testified to by the defendant as having been consummated between himself and the plaintiff on April 10, 1911.

After testifying that Mr. Babcock returned from California on April 3d, 1911, and came to defendant's office on the 4th or 5th, the defendant testified to a conversation between the plaintiff and himself relating to the oil company. He then testified: "I says 'Mr. Babcock, what do you propose.' 'Well,' he says, 'I want you to give me enough of your stock to liquidate your agreement of February 5, 1909, that I hold against you.'" He then testified to considerable conversation as to what he, the defendant, had done in relation to the property, and then that he said: "Under those conditions, do you think it is a fair proposition

to me?" That Mr. Babcock said "All right, if you don't
wish to do it have your shekels ready." "I said, 'Look here,
Mr. Babcock, I will tell you what I will do; you know very
well that I have a number of friends in this company, and I
will tell you I will agree, if you and my brother get together
and he wishes to give you control of this company and sell
you his stock at $10 a share to liquidate his part of that
agreement of February 5, 1909, I will agree to do the same.'
That is all there was. 84 Q. That was practically what was
said? A. At that meeting— 85 Q. At that interview?
A. That is all that was said." He testified further as
follows: "I told my brother to make out my certificate for
1,256 shares, transfer that amount of stock to Mr. Babcock,
as I had agreed with Mr. Babcock to do that." "101 Q.
Now was that certificate made out and did it come into
your possession? A. It was. 102 Q. When did it come
into your possession? A. The following morning, on April
8th. 104 Q. Did you see Mr. Babcock and have an
interview with him on April 8th? A. No, I saw him on
April 10th. 106 Q. And was that certificate of stock in your
possession at the time you saw him on April 10th? A. It
was. 107 Q. Where did you see him? A. He came to
my office. 108 Q. Did he come of his own accord or had
you sent for him? A. He came of his own accord. 109 Q.
Did you have an interview with him at that time? A. I did.
110 Q. What was that interview? A. Mr. Babcock came
in and he said, 'I suppose you know I have purchased from
your brother Harry 1,004 shares of his stock to liquidate his
part of the agreement.' 'Now,' he says, 'What are you
going to do?' I says, 'Mr. Babcock, I agreed to that before
you went to him; I told you I would do it, and here is the
certificate made out for 1,256 shares of my stock. You
figured six shares more than I figured; I figured I owe you
$12,500, and that agreement called for 1,256 shares of stock.'
He says, 'Oh, we will call that interest.' I says, 'All right,
there is your certificate.' 'Now,' I says, 'that with what you
have taken from my brother and this amount of stock gives

you 2,260 shares in this Babcock Oil Company, with which you hold, 250 shares." . . . "That gives you control of this company.' 'Now,' I says, 'I want to know as an officer of this company, I have a small holding left, 58 shares; I want to know, as I have a good many friends, do you wish me to stay with you?' He says, 'Yes, continue as you are for the present.' I says, 'Very well.' I says, 'One thing more I want to ask you; I want to know did you make any other agreement with my brother or any promises?' He says, "No.' I says, 'What? You didn't?' He says, 'Why, yes; I told him that I would pay him $10 a share more, the difference that I bought his stock at and the price that I held it under an option on for $20 a share.' I says, 'Mr. Babcock, are you willing to do that with me?' He says, "Yes.' I says, 'All right. Will you put that in writing?' 'I will see Mr. Champlin,' he said, 'I will have a paper drawn up.'—112 Q. He said he would have a paper drawn up?' A. I says, 'Very well; any time; bring the paper up and bring my release under my part of the agreement.' Just then Mr. Himes came in,—a stockholder in the Babcock Oil Company. I says to Mr. Himes, I says, 'Mr. Babcock has recently taken 1,004 shares of my brother's stock and 1,256 shares—he just closed the transaction with me for, with what he holds gives him control of the company.' I says, 'He now has the control of this company.' He says, 'Mr. Babcock, I would like to know what you are to do with it? I am a stockholder.' He said, 'First I shall bond it, then,' he says, 'I shall plan for a deep well in the development of the property.' 113 Q. What was Mr. Babcock to do in the consideration of your transfer of this stock? A. He was to release me under that agreement of February 5, 1909. 114 Q. He was not to pay you any cash? A. No cash. 115 Q. Was this certificate of stock there at the time Babcock was there? A. It was. 116 Q. Where was it? A. It was in the middle of my desk; I had signed it that morning. 117 Q. You had signed it as President? A. As President. 118 Q. Did it remain there? A. No. I was

in and out of my office on business around the office, and when I came back from one visit I noticed it was on the slide—out of the desk. 119 Q. You testified that Mr. Babcock agreed that this should be put in writing by his counsel? A. Yes. 120 Q. Was that done to your knowledge? A. No, not that I know of. Mr. Babcock came up to see me once or twice afterwards; I asked him about it; he says, 'I have been busy, I haven't got around to it.' I said, 'I wish you would attend to it.' 121 Q. Does that certificate of stock still stand in Mr. Babcock's name? A. It does. 122 Q. Have you retained it in any way? A. No."

The certificate of stock was identified by the defendant and put in evidence. Upon cross-examination he testified that he "never delivered that certificate to Mr. Babcock." "128 C. Q. Why not? A. Why, I expected Mr. Babcock to bring up the papers that he agreed to bring up, the release under that agreement of February 5, 1909, and a paper saying that he would pay me ten dollars a share more. 129 C. Q. And until he brought these papers up you would not deliver that certificate to him, would you? A. No, sir. 130 C. Q. So you never have delivered the certificate? A. I have never delivered the certificate."

The defendant is corroborated by Thomas P. Himes and Robert H. Ferguson as to his statement that he told Mr. Himes in Mr. Babcock's presence that Mr. Babcock had taken 1,004 shares of his brother's stock and 1,256 shares of his stock, and that Babcock had control of the company, and as to the question of Mr. Himes to Mr. Babcock as to what he was going to do with the company and the answer of Mr. Babcock that he was going to bond it, and then plan for a deep well in the development of the property.

The plaintiff denied that any such agreement was made by him with either the defendant or his brother, H. B. Huntoon. He testified that he did not purchase any of the defendant's stock in the Babcock Oil Company; did not agree to purchase any, and did not agree to release him from his obligation under the contract of February 5, 1909.

(1)    Do the facts testified to by the defendant constitute a defence? It is well settled that while accord without satisfaction will not avail as a defence, and satisfaction supposes that the thing stipulated to be done has not only been done by the defendant, but has been accepted in satisfaction by the plaintiff, still the promise itself may be accepted in satisfaction. Thus Ames, C. J., in *Clarke* v. *Hawkins*, 5 R. I. 219, although not finding such to be the fact in the case before him, says, at p. 223, "There are, it is true, certain cases, in which the making of an agreement is itself what is stipulated for by way of accord; so that when this is accepted in satisfaction, it leaves nothing *in fieri*, nothing incomplete."

In *Bennett* v. *Hill*, 14 R. I. 322, 324, the court, Durfee, C. J., p. 324, says: "There is a distinction between an agreement which is itself satisfaction, and one which is to become satisfaction when performed." In 1 Corpus Juris, p. 567, § 98, it is said: "It has been shown in another section that a mere accord which is not followed by execution or satisfaction is as a general rule no bar to an action on the original obligation. This rule, however, presupposes that the agreement of the creditor is to accept the performance of the debtor's promise or agreement, and not the promise or agreement itself. There is a well defined and easily recognized distinction between these two classes of agreements. It is too well settled to admit of doubt that, if the promise or agreement itself and not the performance thereof, is accepted in satisfaction of the demand, and the agreement to accept is based on a sufficient consideration, the demand is extinguished and cannot be the foundation of an action, and it makes no difference whether the original demand was in tort or contract. Under these circumstances there is a valid accord and satisfaction, even though the promise or agreement is not performed. The sole remedy of either party in case of non-performance is by action for breach of the new agreement, the right to insist on the original indebtedness being extinguished. The promise or agree-

ment will not operate as a satisfaction of the debt or demand unless the claimant intended to accept it as such, and such intention must be clearly shown. In some decisions it has been said that an express agreement that the promise shall operate as satisfaction is necessary. In others it has been said that it will be sufficient if the intention of the creditor to accept the promise in satisfaction appears either expressly or by implication, and this is probably a more correct statement of the rule. Whether the promise has been accepted in satisfaction must be determined from the circumstances of each case. So to have the effect of extinguishing the debt a new promise must be one legally binding, operating to extinguish the claim, which can be enforced in substitution therefor. An essential element of such an agreement—like any other contract—is a legally sufficient consideration," citing the above cases and many cases from other jurisdictions, both in this country and in England.

In 1 Am. & Eng. Ency. L. p. 423, it is said: "2. Promise Accepted in Satisfaction.—It is an apparent rather than a real exception to the rule requiring the accord to be executed, that where a promise or new contract is itself accepted in satisfaction of the contract or claim, there the accord and satisfaction is good without performance; but it must appear that the plaintiff accepted the agreement alone in satisfaction and discharge of his cause of action." That such is the law, plaintiff's counsel state. "But," they add, "where it is alleged that the new promise, and not its performance, is accepted in extinguishment of the preexisting obligation, the evidence must clearly show that such was the intention of the parties." This is doubtless true. The burden is upon the party setting up the new promise in extinguishment of the preëxisting obligation, and he is required to prove the new agreement. He must establish it by the preponderance of the evidence.

We think the defendant's testimony as to the making of this new agreement tends to prove an accord and satis-

faction. It is true that the plaintiff never took the certificate of stock which the defendant says he had made out and ready for him at the interview on April 10th, and never delivered to the defendant a release of defendant's obligation under the agreement of February 5, 1909, or a paper agreeing contingently to pay defendant ten dollars per share more. According to the defendant's testimony, however, the new agreement was substituted for the preëxisting agreement. A written release of the defendant's obligation under said preëxisting agreement, therefore, would effect nothing in addition to what had been done by the new agreement (2) itself. It would only furnish evidence corroborative of said new agreement. The same would be true of a paper agreeing contingently to pay ten dollars per share more for the stock. Of course such a release and such a paper would have been of assistance to the defendant in proving the alleged new agreement.

We have considered defendant's testimony given at the last trial as to the transaction on which the defence rests and his statement in detail of what was said by Mr. Babcock and himself at the time of the alleged agreement in substitution for the preëxisting obligation on which the suit was brought. His testimony at the first trial as to what was said by the plaintiff and himself in making said new agreement was shown in evidence at the last trial from the transcript of the evidence at said first trial.

The difference between the defendant's testimony at the last trial and that at the first trial, in regard to the conversation between himself and Mr. Babcock in arriving at the agreement relied upon in defence, is not marked so much by conflict as by dissimilarity, in that, at the last trial, he gave in detail the conversation which, at the first trial, on cross-examination, the plaintiff's counsel, even when assisted, upon request, by defendant's counsel, failed to elicit. (Transcript of evidence, pp. 762–763.) His testimony at the last trial, however, tended to support the pleas upon which the case was submitted to the jury. Therefore the denial of

the motion for the direction of a verdict for the plaintiff was not error. His testimony at the first trial having been put before the jury they had the same opportunity to consider any differences in his testimony at the two trials, that they had to consider all the testimony in the case.

The testimony of the defendant and that of the plaintiff are in direct conflict. The assertions of the defendant as to the alleged 'new agreement are denied by the plaintiff specifically and in detail. Whether the new agreement was substituted for the obligation upon which the suit was brought, so that the making of the new agreement, itself constituted both the accord and the satisfaction, was a question for the jury. The issue of accord and satisfaction was raised by the pleadings and was properly submitted to the jury. In order to find a verdict for the defendant, the jury must have believed his testimony given at the last trial as to what was said by himself and the plaintiff at the time of the making of the alleged new agreement.

The plaintiff's motion for a new trial was denied by the justice who presided at the trial, who, like the jury, saw the witnesses and heard the testimony given in court. After examining the evidence as shown by the transcript, we cannot say that such denial was erroneous.

The first exception is to the ruling of the trial court permitting William C. Huntoon to answer the question: "And what became of the proceeds of these sales from the company to the stockholders?" We think this question was properly allowed. The witness had testified at considerable length as to the organization and conduct of the Babcock Oil Company. He had stated that in the first instance all the stock was issued to his brother and himself upon their conveying the property to the company, and subsequently some was put back into the treasury of the company and sold. The disposition of the proceeds was only the completion of the transaction of sale.

The second exception was taken to the ruling of the trial court permitting Harrison B. Huntoon to answer the

question: "And during the time that you were in charge of the company, aside from the new work which you were required to do in drilling wells, had or had not the business been profitable?" As bearing upon the question as to whether or not the position of the company was such as to make it probable that the plaintiff would desire to purchase its stock, much testimony was given with regard to the production, the amount of oil sold and the price at which it was sold, together with the expenses, and the amounts paid to develop the property. It was proper to show the results of the operation aside from the development. There was no error in admitting this question.

The third exception was taken to the ruling of the trial court permitting Harrison B. Huntoon to answer the question: "Now after, as you have testified, you made this contract with Mr. Babcock by which you sold him your stock, what was done with reference to completing the transaction in any way?" Witness had testified as to his interview with Mr. Babcock in which, as he said, he agreed to transfer to him 1,004 shares of his stock of the Babcock Oil Company. This question was as to a further step relating to the same transaction. In answer the witness testified that the night after Mr. Babcock left his office, which was on the 7th of April, he had a certificate made out for 1,004 shares, four shares being for interest that he figured. In answering another question he said: "That evening I met my brother and asked him to sign it and carried it back with me to the office. The next morning Mr. Babcock came out there and wanted to look at some papers and vouchers that I had on file there, and while he was there he spoke about my brother's stock, and he left soon after that, and after he had gone I realized I had not delivered my certificate to him; so I wrote a letter, enclosing the certificate with the letter in an envelope and mailed it to Mr. Babcock, and in that letter I asked him—" The letter was then offered in evidence and the fourth exception is to the admission thereof.

Upon the question of the admission of this letter the Court said: "The only reason why it seems to me to be material is on account of the extent to which these two lots of stock seemed to have been connected or to have traveled together. It is true that it makes no difference to the jury or the parties here in trying this suit whether he completed his sale or transfer or not, so far as he is concerned; but it does seem to me it is material in looking at it from the other end, looking at it from Mr. Babcock's end, as to how far the getting into Babcock's hands of a majority of the stock may have traveled. On that ground I will allow the fact to be shown. I do not care so much about the particular terms of this letter, but if the letter is necessary in order to show the travel of it I will allow it."

For the reasons given by the court, the admission of the letter which was the subject of the fourth exception did not constitute error.

For the same reason the admission of the question which was the ground of the third exception was not erroneous.

The fifth exception was to the ruling of the trial court permitting Colin McDonald to answer the question: "Aside from the money which it was necessary to expend to drill wells and taking into account only the expense of operation, was the business profitable or otherwise?" This question was admissible upon the same ground as the question which was the subject of the second exception.

The sixth exception was taken to the ruling of the trial court permitting Colin McDonald to answer the question: "You stated, in answer to Judge Harris, that up to the time of the execution of this agreement, June 17, 1911, the company had been able to run along under the provisions of the lease without incurring forfeiture. Did it do that on money that was made or was the money paid in from the outside to enable it to do it?" There had been put in evidence an agreement dated June 17, 1911, by the terms of which the Babcock Oil Company substituted a payment of $500. per month for their obligation to keep in constant operation

one string of drilling tools.    Counsel for the plaintiff claimed
that this agreement was greatly to the disadvantage of the
company and had brought out, upon examination of this
witness, that while the company had been able up to June
17th to pay the cost of drilling, it defaulted on the first pay-
ment of $500.    We think it was proper to ascertain whether
the company had been able to pay the expense and run
along out of its earnings or whether it was paid by con-
tributions.    It was material as bearing upon the financial
condition of the company.    The question was properly
admitted.

The seventh exception was to the ruling of the trial court
permitting William C. Huntoon to answer its question:
"At the time that this certificate for 1,256 shares of stock was
issued to Mr. Babcock in accordance with your instructions,
as you have testified, did you surrender and return to the
company a certificate or certificates of an equivalent or
greater number of shares?" William C. Huntoon had
testified that upon hearing from his brother and before his
final interview with Mr. Huntoon, he had had a certificate
for 1,256 shares made out to Mr. Babcock.    It would, of
course, have been necessary for Mr. Huntoon, upon causing
this certificate to be issued, to surrender to the company a
like number of shares standing in his own name.    There was
no error in admitting the question.

The eighth exception was taken to the ruling of the trial
justice permitting the defendant to place in evidence a copy
of a letter from Harrison B. Huntoon to the plaintiff dated
(3) May 3, 1911.    There had already been put in evidence a
letter from the plaintiff to Harrison B. Huntoon under the
same date of May 3, 1911, in which he returned the certificate
for 1,004 shares sent to him by Mr. Huntoon, stating his
reasons for so doing.    It was proper to admit the letter of
Harrison B. Huntoon in reply as tending to show whether or
not he accepted this stock without objection and also whether
or not he assented to the statements in Mr. Babcock's
letter.

The ninth exception was taken to the ruling of the trial justice permitting Colin McDonald to answer the question: "In the event that they elect to continue, if they elect to continue, they would have to pay at the end of the first year $16,000. How does that amount which they were to pay under the agreement compare with the cost to them of running one string of tools day and night in the drilling of the wells as they were required to do under the original lease before the agreement was made, including all disbursements which were necessary?" This question was admissible upon the same ground as the question which was the subject of the 6th exception. Its admission did not constitute error.

(4)    The eleventh exception is to the modification by the trial justice of the plaintiff's second request to charge, said request being as follows: "It is no defence to this action that the plaintiff agreed to cancel the defendant's obligation to him in consideration of 1,256 shares of the defendant's stock in the Babcock Oil Company unless the defendant delivered, and the plaintiff accepted, said shares;" and said modification being as follows: "I think that would be true, gentlemen, unless in consideration of the equitable pleading if you found there was a bargain in consideration of the stock to cancel the agreement of that in equity the defendant would be entitled to have that carried out. With that exception I charge that second request." This instruction was sufficiently favorable to the plaintiff. The modification was not erroneous.

The twelfth exception is to the modification by the trial justice of the plaintiff's third request to charge, said request being as follows: "In order to find for the defendant the jury must find that it is specifically proved that the plaintiff accepted in cancellation of the defendant's obligation the defendant's promise to deliver the stock to the plaintiff;" and said modification being as follows: "That also I charge with the same exception that if you found that the equitable plea was sustained by which the mere promise to transfer the

stock was accepted in consideration of the other man's mere promise to cancel." The plaintiff's request is a correct statement of the law. The exception however made by the court in the modification is not really an exception at all unless it can be considered as having excluded from the jury the consideration of the new amended third plea, and this could not injure the plaintiff. Said new amended third plea sets up that the promise to transfer the stock was accepted in consideration of the promise to cancel this agreement, as does the equitable fifth plea. The instruction as given was not erroneous.

All the plaintiff's exceptions are overruled and the case is remitted to the Superior Court with direction to enter judgment for the defendant upon the verdict.

*Irving Champlin, James Harris,* for plaintiff.
*John C. Knowles,* of counsel.
*Gardner, Pirce & Thornley,* for defendant.